IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| GARRET MOYER | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| WICHITA STATE UNIVERSITY | ) | |
| | ) | Case No. **6:18-CV-1199** |
| Serve: | ) | |
| Attorney General of the State of Kansas | ) | |
| Derek Schmidt | ) | |
| 120 SW 10th Ave., 2nd Floor | ) | |
| Topeka, Kansas 66612 | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL
## AND DESIGNATION OF PLACE OF TRIAL

COMES NOW, Plaintiff Garret Moyer, ("Moyer or "Plaintiff"), by and through undersigned counsel, files his Complaint and Demand for Jury Trial and Designation of Place of Trial against Defendant Wichita State University ("WSU" or "Defendant").

### INTRODUCTION

1.      "There is considerable value, moreover, in encouraging, rather than inhibiting, speech by public employees. For government employees are often in the best position to know what ails the agencies for which they work. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." Lane v. Franks, 134 S. Ct. 2369, 2377 (U.S. 2014).

2.      After his complaint, Plaintiff experienced a systematic pattern of retaliation at the hands of the Defendant. Said retaliation included, but certainly was not limited to, baseless and exceedingly negative job performance evaluations, removal from his job, psychological evaluations and ethical complaints. Furthermore, after his complaint, Plaintiff

was subjected to a hostile work environment rife with harassment and unwarranted scrutiny. This hostility continues to this day.

## PARTIES

3.      Plaintiff is an individual and resident of the State of Kansas residing at 9911 E. 21st Street North, Apartment 612, Wichita, Kansas 67206.

4.      Defendant using the name of Wichita State University ("WSU") is a state agency pursuant to K.S.A. §76-711(a) and 76-712 and may be served with notice and summons by serving the Attorney General of the State of Kansas, Derek Schmidt, 120 SW 10th Ave., 2nd Floor, Topeka, Kansas 66612 or Wichita State University, Chief Executive Officer, 1845 N. Fairmont Street, Wichita, Kansas 67206.

5.      Defendant is a state educational institution, considered a state agency and is a recipient of federal financial assistance.

6.      Defendant is an "employer" within the meaning of Title VII, K.S.A. §44-1001, et seq.

7.      During calendar years 2000-2014, for each working day during each of 20 or more calendar weeks, Defendant employed 50 or more employees.

8.      Defendant had at least 15 employees at all relevant times.

9.      Defendant is an entity which acts through agents. It is liable for the conduct of its agents acting within the course and scope of their agency, its own negligence, the acts of its agents which it ratifies, injuries incurred by agents' performance of its non-delegable duties, act done by agents for which the agency relationship allows or assist the agent to perform, and acts its agents take by virtue of their position with Defendant.

10.     Plaintiff is an "employee" as defined by Title VII because he was an individual employed by WSU.

11.     This is an action for discrimination in violation of the Americans with Disabilities act ("ADA" or "ADAAA"), violation of Title VII of the Civil Rights Act, violation of the Family Medical Leave Act and violation of 42 U.S.C. Section 1981.

## JURISDICTION

12.     This Court has original jurisdiction in this action pursuant to 28 U.S.C. sections 1331 and 1343, 42 U.S.C. 1981 and 42 U.S.C. Section 2000e-5, in as much as the matter in controversy is brought pursuant to Title VII of the Civil rights Act of 1964, 42 U.S.C. Section 2000e et seq., the Americans with Disabilities Act, as amended in 2008 ("ADA"/"ADAAA"), 42 U.S.C. Section 12101, et seq, Family Medical Leave Act, and 42 U.S.C. Section 1981. This District possesses venue of this matter pursuant to 42 U.S.C. Section 2000e-5(f) and 28 U.S.C. 1391 (b)(1). The Court may exercise jurisdiction over Plaintiff's state law claims, if any, under 28 U.S.C. Section 1367. The jurisdiction of this Court is invoked to secure protection and redress deprivations of rights guaranteed by federal law which rights provide for injunctive relief and other relief for illegal employment discrimination.

13.     WSU is subject to suit in the federal court because its Eleventh Amendment immunity was validly abrogated by Congress when Congress enacted Title VII of the Civil Rights Act of 1964 pursuant to the 14th Amendment, which was duly ratified by the States.

14.     Venue is proper in that Defendant is located within this District and the acts complained of took place within this District.

15.     On or about August 18, 2017, Plaintiff filed a Charge of Discrimination against Defendant WSU that was dually filed with the Kansas Human Rights Commission ("KHRC") and

the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based upon disability and retaliation.

16.     A true and accurate copy of the Charge of Discrimination against Defendant WSU dated August 18, 2017 is attached hereto as **Exhibit "A"**.

17.     The aforesaid Charge of Discrimination provided the KHRC and/or EEOC sufficient opportunity to investigate the full scope of the controversy between the parties and, accordingly, the sweep of this judicial complaint may be and is as broad as the scope of the KHRC and/or EEOC investigation, which could reasonably be expected to have grown out of the Charge of Discrimination.

18.     On or about April 12, 2018, the EEOC issued Plaintiff his Notice of Right to Sue Letter pertaining to his complaint of discrimination for Charge Number 563-2017-01947.

19.     A true and accurate copy of Plaintiff's Notice of Right to Sue Letter dated April 12, 2018 is attached hereto as **Exhibit "B"**.

20.     Plaintiff has filed his lawsuit within 90 days of his receipt of his "dismissal and Notice of Rights" letter from the EEOC.

21.     Plaintiff has satisfied all private, administrative, judicial prerequisites to the institution of this action.

## FACTS COMMON TO ALL COUNTS

22.     Plaintiff hereby incorporates by reference every allegation and averment in the preceding and foregoing paragraphs as though fully set forth herein.

23.     Plaintiff is male.

24.     Plaintiff is Caucasian.

25.     Plaintiff is over the age of 40 years old.

26.     In or around October 2000, Plaintiff began working as a Police Officer for Defendant WSU as a permanent, full-time employee.

27.     On or about March 20, 2011, Plaintiff was promoted to Police Sergeant.

28.     On or about April 11, 2017, Plaintiff was paid approximately $55,000 per year.

29.     From 2011 through 2016, Plaintiff received positive evaluations and consistently met expectations.

30.     On or about July 5, 2016, Dr. Erin Lohman completed a psychoeducational evaluation of Plaintiff.

31.     Dr. Lohman indicated the reason for evaluation as:

> Garret is pursuing testing at this time in order to provide current documentation of a learning disability so that he may pursue formal accommodations in school and/or work.

32.     Dr. Lohman's Diagnostic Impressions were that Plaintiff suffers from Dyslexia, an impairment in reading, Spelling Accuracy, an impairment in written expression, and Dyscalculia, an impairment in mathematics.

33.     Based upon her findings, Dr. Lohman made the following recommendations for possible reasonable accommodations: extended time, note taker for lecture-based classes, a reader for timed and/or in-class quizzes and tests, access to books on tape, access to PowerPoint slides or lecture notes, ability to audio record lectures for later review, and use of a word processor for all in-class assignments.

34.     Further, Dr. Lohman found that it may be beneficial for Plaintiff to read his writing aloud before sending/submitting texts, emails, or writing assignments.

35.     Plaintiff informed Defendant about his diagnoses and his need for accommodations.

36.     On several occasions, Sara Morris, the Chief of Police for Defendant, would ask Plaintiff how he was doing with his disabilities and if accommodations would assist him.

37.     Chief Morris allowed Plaintiff to install software onto his work computer, recommended by Grady Landrum, Director of Disability Services for Defendant, which assisted Plaintiff with administrative duties.

38.     In or around July 2016, on several occasions, Captain Cory Herl, would enter the office and ask Plaintiff what was wrong.

39.     Plaintiff would insist that nothing was wrong, but Captain Herl would make comments such as "you are not happy".

40.     In or around November 2016, Demario Smith, a Police Officer for Defendant, complained that he was being racially discriminated against by his supervisors and Chief Morris.

41.     In or around December 2016, Chief Morris told Plaintiff that Officer Smith had filed a complaint against her.

42.     In or around December 2016, Chief Morris told Plaintiff that because of Officer Smith's discrimination complaint to Human Resources, Defendant's Executive Staff gave her "one more chance" to get things right or she would be dismissed.

43.     During a meeting discussing Chief Morris' risk of being terminated, Sergeant Brad Agnew put a picture of an African-American Lieutenant from the Wichita Police Department on an office computer screen and said that if Chief Morris was terminated and this woman was hired, it was "going to get a little dark in here".

44.     In or about early January 2017, Plaintiff had a meeting with supervisors in which Chief Morris informed him that he would be moving to Second Shift to cover supervisory duties while a peer was on medical leave.

45.     In or about early January 2017, Plaintiff asked Chief Morris about having Friday and Saturday off, as he did on his previous shift.

46.     Upon information and belief, Chief Morris would allow "good days" off to employees who moved to a different shift at his request.

47.     In or about early January 2017, Chief Morris denied the request, and while smiling and laughing, stated that Plaintiff would have to take specific days off so that he could "watch" Officer Smith.

48.     Following that meeting, in or about early January 2017, Sergeant Bryson Potter told Plaintiff that he had been disciplined for not writing up Officer Smith.

49.     Further, Sergeant Agnew made comments about not wanting Officer Smith in the department because he was lazy.

50.     In or around January 2017, Sergeant Kyle Garwood told Plaintiff that people "like" Officer Smith are lazy. Further, Sergeant Garwood alluded to Officer Smith's race on several occasions.

51.     Further, in or around January 2017, Sergeant Garwood used his university email address to send an email to Plaintiff with a calendar invite entitled "FUCK YOU".

52.     As Plaintiff was also a student at Wichita State University during this time, he had a student advisor, Kristen Brewer.

53.     Coincidentally, Ms. Brewer is Officer Smith's wife.

54.     On or about January 31, 2017, Plaintiff had a meeting with Ms. Brewer to discuss school topics.

55.     While discussing school topics, Plaintiff became visibly uncomfortable and Ms. Brewer asked him what was wrong.

56.     On or about January 31, 2017, Plaintiff told Ms. Brewer that he felt as though Chief Morris was trying to get him to target Officer Smith in order to fire him and/or force him to quit.

57.     On or about January 31, 2017, after further discussion, Ms. Brewer called Dr. Linnea GlenMaye, the Vice President of Academic Affairs, to ask that she join the meeting.

58.     On or about January 31, 2017, Plaintiff explained to Dr. GlenMaye the behaviors of Chief Morris and other supervisors that he believed to be racially discriminatory.

59.     On or about January 31, 2017, Dr. GlenMaye advised Plaintiff to file a University EEOC Complaint.

60.     On or about January 31, 2017, Plaintiff informed Dr. GlenMaye that he did not want to file a complaint because he feared that Defendant would retaliate against him.

61.     On or about January 31, 2017, Dr. GlenMaye, seeming understanding, assured Plaintiff that everything said in the meeting was confidential and would not leave the room.

62.     On or about March 3, 2017, having heard Plaintiff's concerns from his wife, Kristen Brewer, Officer Smith told Plaintiff that he appreciated what Plaintiff was doing for him, but apologized that Plaintiff was going to be "in the middle of a witch hunt".

63.     Following Officer Smith's comment, Plaintiff emailed Chief Morris to inform her of Officer Smith's comment.

64.     In or around the middle of March 2017, Chief Morris had Officer Smith's files laying on a desk while she "laid out the plan" to Plaintiff on how to write up Officer Smith.

65.     In or around the middle of March 2017, Chief Morris told Plaintiff to "keep an eye on" Officer Smith with the intention of "getting rid of him".

66.     In or around the middle of March 2017, Plaintiff took the meeting with Chief Morris to mean that she wanted Plaintiff to write up Officer Smith for everything possible in order

to push him out.

67.     In or around the middle of March 2017, Chief Morris, noticing that Plaintiff was uncomfortable, asked Plaintiff if he was "still with her".

68.     In or around the middle of March 2017, Plaintiff stated "no" and walked out of the meeting.

69.     At or around March 2017, Dr. GlenMaye and Chief Morris were serving on a committee for Defendant together.

70.     Upon information and belief, Dr. GlenMaye discussed the information that Plaintiff had previously shared with her with Chief Morris.

71.     On or about April 6, 2017, Chief Morris questioned Plaintiff about his "actions" from his meeting with Dr. GlenMaye and Ms. Brewer on or about January 31, 2017.

72.     On or about April 6, 2017, Plaintiff openly admitted that he had expressed his concerns regarding management and supervision for Defendant as he believed that Defendant's management was actively engaging in discriminatory behaviors against African-American officers, specifically Officer Smith.

73.     On or about April 6, 2017, Chief Morris asked Plaintiff why he believed that Defendant's management was engaging in discriminatory behavior.

74.     On or about April 6, 2017, Plaintiff explained various behaviors by Defendant's managerial staff, specifically Chief Morris, Sergeant Brad Agnew, and Captain Cory Herl.

75.     On or about April 6, 2017, Plaintiff mentioned that Chief Morris asked him to closely watch Officer Smith and write him up for every infraction.

76.     On or about April 6, 2017, Plaintiff also mentioned that Sergeant Agnew had told him on several occasions that he had a reputation as being a "racist cop" during his employment at

the Wichita Police Department.

77.     On or about April 6, 2017, Plaintiff advised her of the instances in which Sergeant Agnew stated that it was "going to get a little dark in here" in reference to the potential hiring of an African-American Chief of Police.

78.     On or about April 6, 2017, Further, Plaintiff discussed that Captain Herl had previously made comments about Officer Smith's ethics and the need to write him up as often as possible.

79.     On or about April 6, 2017, Chief Morris took notes during the meeting with Plaintiff.

80.     On or about April 6, 2017, at the end of their meeting, Chief Morris stated "I know what I got to do" as Plaintiff left her office.

81.     On or about April 10, 2017, Chief Morris emailed Plaintiff and stating:

> Please disregard attending training tomorrow. You are scheduled to meet with Marcie Holsteen, Tuesday, 04/11/2017 at 0800 hours at HR. This is a follow-up of our conversation and the events on January 31, 2017.

82.     On or about April 11, 2017, Plaintiff met with Ms. Holsteen in her office and conveyed his concerns of discriminatory behaviors due to being in fear of losing his job.

83.     On or about April 11, 2017, Ms. Holsteen asked Plaintiff about the events of January 31, 2017 and the details of his meeting with Ms. Brewer and Dr. GlenMaye.

84.     On or about April 11, 2017, Plaintiff advised Ms. Holsteen that he believed his conversation with Dr. GlenMaye and Ms. Brewer was confidential.

85.     On or about April 11, 2017, Plaintiff explained the events of January 31, 2017 to Ms. Holsteen, while expressing that he was upset and believed it was whistleblowing.

86.     On or about April 11, 2017, Ms. Holsteen did not show any remorse for Plaintiff's

concerns and ultimately pressured him into agreeing not to file a formal complaint with Defendant's EEOC Director.

87.     On or about April 11, 2017, Ms. Holsteen then advised Plaintiff that Chief Morris had expressed concerns about Plaintiff's mental health.

88.     On or about April 11, 2017, Plaintiff challenged these claims, but Ms. Holsteen failed to provide any further information.

89.     On or about April 11, 2017, instead, Ms. Holsteen administered a fit-for-duty evaluation on Plaintiff, even though she had no prior experience in administering these evaluations.

90.     On or about April 11, 2017, Further, Ms. Holsteen verbally implied that if Plaintiff refused to sign a release form allowing Dr. David Bowman, a Licensed Psychologist, access to Plaintiff's medical records in possession of his personal psychologists, that his job would be in jeopardy.

91.     On or about April 11, 2017, Ms. Holsteen failed to provide Plaintiff with accommodation(s) for his disabilities when administering the evaluation.

92.     On or about April 11, 2017, during the exam, Plaintiff was forced to sit an area that had phones ringing, keyboard/typing sounds, and people talking on the phone, which are all causes that can worsen Plaintiff's disabilities.

93.     On or about April 11, 2017, while completing the exam, Plaintiff had to ask Ms. Holsteen how to pronounce a word or the meaning of a word on several occasions, which led to Plaintiff feeling as though he was bothering Ms. Holsteen.

94.     On or about April 11, 2017, Ms. Holsteen gave Plaintiff an ink pen to use to complete the test, instead of a number-two pencil, as required. As soon as he realized this, Plaintiff complained to Ms. Holsteen and was denied the opportunity to complete a new exam.

95.     On or about April 11, 2017, after filling out the written portion of the exam, Plaintiff participated in a clinical interview with Dr. Bowman.

96.     On or about April 11, 2017, following the fit-for-duty evaluation, Plaintiff was told by Ms. Holsteen that he was being placed on Administrative Leave with pay and was not to be around the University Police Department pending the results of the evaluation.

97.     On or about April 13, 2017, Dr. Bowman spoke with Dr. Maureen Dasey-Morales, a Licensed Psychologist who had been providing treatment and evaluation to Plaintiff for the previous four (4) years.

98.     In a report submitted by Dr. Bowman to Defendant, Dr. Bowman notes his conversation with Dr. Dasey-Morales stating:

> She described [Plaintiff] as thin-skinned & easily hurt, as well as struggling to overcome catastrophic worry. he noted . . . [a] primary precipitant for Garret's chronic mental health issues . . . as the social-emotional impact of his learning disability.

99.     Dr. Bowman's report states:

> **REASON FOR REFERRAL:** The Chief of the Wichita State University Police Department asked that Sergeant Moyer, who is currently on administrative leave, undergo an FFDE due to multiple performance issues.

100.    Dr. Bowman's report states:

> When I commented that Garret's personality seemed poorly suited for law enforcement, Dr. Dasey-Morales replied, "for two years I've been talking to him about finding a different job."

101.    Dr. Bowman's report states:

> He acknowledged his recent emotional crisis and loss of control, but seemed oblivious as to how his behavior has deteriorated workplace relationships and trust. He expressed a naively optimistic and determined attitude about furthering his career, regardless of the obstacles.

102.    Included in his reasoning for finding Plaintiff "psychologically unfit for duty", Dr.

Bowman states:

> Much of [Plaintiff's] recent distress is likely due to the realization that he is 'in over his head'. Given the chronic nature of his personality traits and the fact that he has long sought out mental health treatment, it is unlikely that his stability & fitness will significantly improve in the future.

103.    Prior to April 2017, Defendant had knowledge that Plaintiff received mental health treatment.

104.    Prior to April 2017, Defendant was aware that Plaintiff required accommodations for his disabilities.

105.    Defendant required that Plaintiff take the fit-for-duty evaluation without providing him with reasonable notice.

106.    Plaintiff was not given the opportunity to submit an online "Test Request Form" to Defendant's Disabilities Services, to request accommodations he needed to complete the examination.

107.    On or about April 18, 2017, Defendant, through Ms. Holsteen, informed Plaintiff that he was found "unfit for duty".

108.    Plaintiff challenged Dr. Bowman's findings and requested to see the completed evaluation.

109.    University Policy 3.37 states, among other things, that "Each employee should be aware of all documentation in the official personnel file and shall be provided access to his/her own official personnel file upon request."

110.    Ms. Holsteen denied Plaintiff access to the evaluation, in violation of University Policy 3.37.

111.    On or about April 18, 2017, Plaintiff was removed from his position as University Police Sergeant.

112.    Upon removing him from his position as University Police Sergeant, Defendant informed the Commission on Peace Officers' Standards (CPOST) that he had been removed.

113.    Plaintiff was to remain on paid administrative leave with benefits through Defendant for 60 days, through June 17, 2017.

114.    Plaintiff was given 60 days to obtain another position through Wichita State University.

115.    If Plaintiff was unable to find another position through Wichita State University within 60 days, then his employment with the University would be terminated.

116.    On or about April 19, 2017, Plaintiff met with Jane Link, Director of Equal Opportunity Office (EEO) for Defendant.

117.    On or about April 19, 2017, Plaintiff filed a formal complaint against defendant, specifically Chief Morris, alleging that Chief Morris was behaving discriminatorily and that she had failed to accommodate Plaintiff's disabilities when administering the fit-for-duty evaluation.

118.    On or about April 19, 2017, Ms. Link suggested that Plaintiff complete Family Medical Leave (FMLA) paperwork to submit to Defendant.

119.    On or about April 21, 2017, Plaintiff applied for FMLA through Defendant.

120.    On or about April 25, 2017, Defendant denied Plaintiff's FMLA request claiming he was not eligible because he had been relieved of his duties and placed on Administrative Leave.

121.    Following the filing of his EEO complaint, Ms. Link did an investigation into Plaintiff's claims.

122.    As part of her investigation, Ms. Link interviewed Chief Morris.

123.    As part of her investigation, Ms. Link interviewed Plaintiff.

124.    On or about June 20, 2017, Ms. Link sent a letter to Plaintiff with the results of her

investigation.

125.    On or about June 20, 2017, Ms. Link sent a letter to Plaintiff stating, among other things, as follows:

> Within three business days of discovering that you had been to talk with a University administrator outside the UPD regarding concerns of behavior you believed may be discriminatory Chief Morris, in coordination with Human Resources, arranged for the administration of a fit for duty psychological evaluation.

126.    Ms. Link found that Chief Morris violated Defendant's Policy 3.47 by not accommodating his disabilities.

127.    Ms. Link stated, "you were aware of Mr. Moyer's dyslexia and should have made accommodation available to him for the administration of the examination".

128.    Mr. Link issued the following recommendations to Chief Morris:

> Re-administer the written portion of the fit for duty psychological examination with accommodation for dyslexia. Utilize a qualified psychologist to interpret the fit for duty examination other than the psychologist, or any partner of the psychologist, that interpreted the April 11, 2017 fit for duty examination. Complete the re-administration within fifteen (15) University business days from the date of this letter.

129.    Further, Ms. Link stated that as a consequence for the policy violation, Chief Morris would have a copy of the outcome letter placed in her personnel file as a written reprimand.

130.    On or about June 26, 2017, Chief Morris sent an appeal request to Dr. Richard Muma, Senior Associate Vice President for Academic Affairs and Strategic Enrollment Management, challenging the findings of Ms. Link's investigation.

131.    Within her appeal, Chief Morris claims:

> The term "should" implies an obligation . . . There is no indication of any "obligation" to provide accommodations or that I "should" have provided accommodations for a disability if no request has been made.

132.   Within her appeal, Chief Morris states that she spoke with Grady Landrum, Director of the Office of Disability Services, and Sarah Hunter, Assistant Director of Total Rewards, and they both indicated that "just because you aware of a disability, you are not obligated, as an employer, to provide accommodations".

133.   Within her appeal, Chief Morris further states that the employee must be the one to initiate the interactive process for accommodations.

134.   On or about June 26, 2017, Chief Morris sent an email, among other things, stating

> I would say my appeal is based primarily on section i. A procedural or substantive error occurred that significantly affected the outcome of the case. If I need to define why I feel this, it would be because I feel a substantive error occurred due to a lack of knowledge or inconsistency with common practice as well as the practice for WSU, in regards to when an employer is obligated to provide accommodations.

135.   After receiving Chief Morris's appeal, Plaintiff sent a letter to Dr. Muma in response to Chief Morris's appeal.

136.   On or about July 10, 2017, Dr. Muma responded to Chief Morris's appeal finding that her appeal lacked standing and the original decision by Ms. Link would stand.

137.   On or about July 11, 2017, as recommended by Ms. Link, Plaintiff underwent another fit-for-duty evaluation given by Dr. Bruce Nystrom.

138.   Dr. Nystrom openly admitted to Plaintiff that he had previously served on the Wichita Police Department with Chief Morris and Captain Schroeder, so he had known them for many years.

139.   Within his report, Dr. Nystrom states that he reviewed Dr. Bowman's fit-for-duty evaluation report prior to making his findings.

140.   In addition, Dr. Nystrom states that he reviewed the email correspondence from Plaintiff to Chief Morris from February and March of 2017.

141.    The emails from Plaintiff to Chief Morris have no relation to the fit-for-duty psychological evaluation.

142.    In his summary, Dr. Nystrom found that due to having a "clear learning disability" and a "strong underlying source of anxiety", Plaintiff was unfit for duty.

143.    Dr. Nystrom concluded his report with:

> While [Plaintiff] likely is quite fit to perform other law enforcement duties, he is not capable of performing the current administrative requirements in a competent manner.

144.    On or about August 2, 2017, Mr. Don Read, an Investigator with the Kansas Commission on Peace Officers' Standards and training (KSCPOST), sent a letter to Plaintiff stating that there was an investigation into the eligibility for certification of his Police License, and he would be interviewed on that same day.

145.    On or about August 3, 2017, Mr. Read submitted an investigative summary memo to the KSCPOST, outlining his conversation with Plaintiff. Mr. Read did not make any findings or recommendations based upon his investigation, other than noting that Dr. Nystrom stated to him that Plaintiff was "not fit for duty".

146.    On or about August 11, 2017, KSCPOST filed a Summary Order of Suspension ordering that Plaintiff's law enforcement certification be suspended effective immediately.

147.    On or about August 24, 2017, KSCPOST sent a letter to Plaintiff stating that his request for a hearing by the KSCPOST Hearing Committee, sent a few days prior, had been received, and a hearing would be scheduled.

148.    On or about August 31, 2017, Plaintiff was terminated.

149.    On or about September 2, 2017, Plaintiff went to an outside psychologist, Shawn McDaniel, to get a third opinion on his fitness for duty evaluation.

150.    Dr. McDaniel found inconsistencies within Dr. Nystrom's evaluation report, and ultimately recommended that Plaintiff be considered "fit for unrestricted duty".

151.    While Dr. McDaniel acknowledges that it would be the decision of the employer whether to allow Plaintiff to perform administrative duties in a supervisory capacity and/or what reasonable accommodations would be available, he notes that "[Plaintiff] had apparently been functioning well in that capacity prior to certain events over the past several years".

152.    On or about October 16, 2017, Plaintiff went to a fourth Licensed Psychologist, Dr. Daniel Claiborn, to conduct a fit-for-duty evaluation.

153.    Within Dr. Claiborn's evaluation report, he discusses his interview with Dr. Dasey-Morales in which he states that:

> [Dr. Dasey-Morales] was shocked to learn [Plaintiff's] performance as a law enforcement officer had been questioned. He has never shown her any signs of unfitness or potential dangerousness to others.

154.    Dr. Claiborn's statement is contrary to Dr. Bowman's April 2017 report alleging that Dr. Dasey-Morales had advised him that she had been urging Plaintiff to get a different job for two (2) years.

155.    Dr. Claiborn found that if Plaintiff were being considered for a law enforcement position, he would be "recommended for further consideration" and is considered "fit for duty".

156.    Dr. Claiborn states:

> [Plaintiff's] physician and psychologist, both of whom have known Mr. Moyer for years, have never had any concerns about medical or psychological issues that would compromise Mr. Moyer's safety or job performance. He has not only sought their help when appropriate, but he has followed their recommendations.

157.    On or about October 27, 2017, Plaintiff filed a Motion to Lift Suspension of his law enforcement certification, given the fit for duty evaluations completed by Dr. McDaniel and

Dr. Claiborn.

158.    On or about October 30, 2017, KSCPOST filed a Response to Motion to Lift Suspension, acknowledging the validity of Dr. Claiborn's evaluation and granted the motion, thereby lifting the suspension on Plaintiff's law enforcement certification.

159.    On or about November 20, 2017, KSCPOST filed a Motion to Vacate Summary Order of Suspension. Within its Motion, KSCPOST stated that the validity of Dr. Bowman's fitness for duty evaluation was in question because Plaintiff was not given accommodations for his disabilities.

160.    On or about November 20, 2017, Defendant and Plaintiff participated in mediation through the EEOC.

161.    On or about November 22, 2017, Bradley Schoen, Commissioner of Hearing Panel for KSCPOST, ordered that Plaintiff's suspension be lifted.

162.    On or about January 7, 2018, Sergeant Kyle Garwood left Plaintiff a voicemail in which he stated that he wanted to talk.

163.    On or about January 15, 2018, Sergeant Garwood went to Plaintiff's home early in the morning and knocked on Plaintiff's door for approximately two (2) minutes.

164.    Plaintiff filed a police report with the Wichita Police Department out of fear of Sergeant Garwood's intentions.

165.    On or about April 11, 2018, Sergeant Agnew left Plaintiff a voicemail stating that he no longer worked for Defendant and that he was in the same situation that Plaintiff was a year ago.

166.    Prior to April 11, 2017, Plaintiff informed Defendant of his impairments and his need for reasonable accommodations.

167.    Defendant failed to provide Plaintiff with the reasonable accommodations that he requested.

168.    Defendant pushed Plaintiff to complete duties assigned to him even knowing that Plaintiff struggled to do so without proper accommodations.

169.    Plaintiff further was the victim of discriminatory and retaliatory conduct on the part of the Defendant that was ongoing and pervasive and constituted a "continuing violation" of Plaintiff's rights.

170.    Plaintiff further was the victim of discriminatory and retaliatory conduct on the part of the Defendant that was a continuing pattern of discrimination and/or retaliation.

171.    Upon information and belief, Defendant has engaged in a pattern or practice of discrimination and retaliation against people that are similarly situated to Plaintiff, and Defendant's conduct towards Plaintiff was a part of this pattern or practice.

172.    Defendant was aware that Plaintiff had been previously diagnosed with dyslexia.

173.    Plaintiff's dyslexia is a disability as defined by the ADA.

174.    Due to Plaintiff's serious medical conditions, impairments and/or disabilities, Plaintiff began having trouble completing administrative tasks without a reasonable accommodation while working for Defendant.

175.    Plaintiff suffers from mental impairments, dyslexia, spelling accuracy, and dyscalculia, which substantially limits one or more of his major life activities, including, but not limited to: accomplishment of his daily routines of life, concentrating, thinking, communicating, interacting with others and working.

176.    Under the ADA, it is the employer's burden to educate itself about the varying nature of an impairment and to make individualized determinations about affected employees.

177.    An employer must make an individualized assessment of each employee's actual abilities to perform the job at the time of the employment decision.

178.    Complaining to anyone, including to management or other employees, is protected opposition.

179.    Defendant relied on unsubstantiated and cursory medical opinion from Dr. David Bowman to find Plaintiff not fit for duty.

180.    Defendant relied on unsubstantiated and cursory medical opinion from Dr. Bruce Nystrom to find Plaintiff not fit for duty.

181.    Defendant treated Dr. David Bowman's opinion as having settled the question of whether Plaintiff was qualified for the job.

182.    Defendant treated Dr. Bruce Nystrom's opinion as having settled the question of whether Plaintiff was qualified for the job.

183.    The record is replete with factual evidence available to Defendant at the time it made decisions about Plaintiff -- particularly Plaintiff's successful performance of police jobs that Dr. David Bowman claimed Plaintiff was unqualified to do -- that flatly contradicted Dr. David Bowman's unsubstantiated conclusion.

184.    The record is replete with factual evidence available to Defendant at the time it made decisions about Plaintiff -- particularly Plaintiff's successful performance of police jobs that Dr. Bruce Nystrom claimed Plaintiff was unqualified to do -- that flatly contradicted Dr. Bruce Nystrom's unsubstantiated conclusion.

185.    Defendant was not entitled to simply rely on the physician's recommendation as the basis for suspending and terminating Plaintiff.

186.    Employers do not escape their legal obligations under the ADA by contracting out

certain hiring and personnel functions to third parties.

187.    The ADA expressly prohibits employers from "participating in a contractual or other arrangement that has the effect of subjecting a covered entity's qualified applicant or employee to... discrimination." 42 U.S.C. § 12112(b)(2); see Piquard v. City of East Peoria, 887 F.Supp. 1106, 1124 (C.D. Ill. 1995) (

188.    Section 12112(b)(2) was intended to prohibit an entity from doing through a contractual relationship what it may not do directly.

189.    The ADA's prohibitions against employment discrimination expressly extend to medical examinations and inquiries. See 42 U.S.C. § 12112(d)(1).

190.    The regulations promulgated under the ADA provide that "[t]he results of such [medical] examination shall not be used for any purpose inconsistent with [the ADA]." 29 C.F.R. 1630.14(b)(2).

191.    Defendant has no objective evidence to support its belief that Plaintiff posed a significant risk to the health and safety of others.

192.    Defendant violated the ADA by sharing Plaintiff's medical information.

193.    An employer can ask disability-related questions and only if they are "job-related and consistent with business necessity." 42 U.S.C. §12112(d)(4)(A).

194.    An employer can conduct medical evaluations only if they are "job-related and consistent with business necessity." 42 U.S.C. §12112(d)(4)(A).

195.    A disability-related question or medical examination is job related and consistent with business necessity when an employer reasonably believes based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition.

196.    The direct threat scenario requires "a significant risk of substantial harm that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. §1630.2(r).

197.    To determine whether an employee poses a direct threat, an employer must conduct an "individualized assessment" of the employee's ability to perform the essential functions of the job safely while considering "a reasonable medical judgment relying on the most current medical knowledge and/ or best available objective evidence." 29 C.F.R. §1630.2(r).

198.    Factors to be considered are the duration of the risk, the nature and severity of the potential harm, the likelihood of potential harm, and the imminence of potential harm. 29 C.F.R. §1630.2(r).

199.    An employer must have a reasonable belief based on objective evidence that an employee poses a direct threat before requiring this medical examination.

200.    An employer's reasonable belief that an employee cannot perform essential functions of the job because of a medical condition or poses a direct threat because of a medical condition must be founded on objective evidence before asking disability-related questions.

201.    An employer's reasonable belief that an employee cannot perform essential functions of the job because of a medical condition or poses a direct threat because of a medical condition must be founded on objective evidence before conducting medical evaluations.

202.    An employer with the required reasonable belief is entitled only to the minimal amount of medical information necessary to determine whether an employee can perform the essential functions of the job or work without posing a direct threat.

203.    An employer typically cannot request an employee's complete medical records because those records will likely contain extraneous information unnecessary to the analysis.

204.    The inquiry needs to be limited to information about the specific job duties and the

specific direct threat.

## COUNT I
## FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADAAA

205.     Plaintiff hereby incorporates by reference every allegation and averment in the preceding and foregoing paragraphs as though fully set forth herein.

206.     Plaintiff has disabilities as defined by the Americans with Disabilities Act, to-wit:

a.      Plaintiff suffers from mental impairments, dyslexia, spelling accuracy, and dyscalculia, which substantially limits one or more of his major life activities, including, but not limited to: accomplishment of his daily routines of life, concentrating, thinking, communicating, interacting with others, and/or working,

b.      a record of such impairments; and,

c.      Defendant regarded Plaintiff as having such impairments.

207.     Plaintiff is a qualified individual with disabilities as defined by the Americans with Disabilities Act.

208.     Defendant violated the ADA, among other things, by the following acts:

a.      Discharging or otherwise limiting, segregating, or classifying Plaintiff in a way that adversely affected the opportunities or status of Plaintiff because of his disabilities and/or requests for accommodation;

b.      Subjecting Plaintiff to disparate treatment and harassment based on his disabilities and/or requests for accommodation;

c.      Creating and subjecting Plaintiff to a hostile work environment based on Plaintiff's disabilities and/or requests for accommodation.

209.     Plaintiff, with reasonable accommodations, was able to, and would have been able to, perform the essential functions of his position with Defendant.

210.    During his employment, Plaintiff made repeated verbal and/or written requests for reasonable accommodations for his disability.

211.    Such reasonable accommodation requests by Plaintiff included, but, were not limited to: a quiet office space, additional time to complete administrative tasks, and use of a word processer.

212.    Defendant reprimanded Plaintiff for requesting and/or using his reasonable accommodations.

213.    Defendant denied Plaintiff's requests for reasonable accommodations, failed to provide requested reasonable accommodations, and withdrew previously agreed to reasonable accommodations at the time of his fit for duty evaluation.

214.    While employed by Defendant, Plaintiff was excluded from participation in, denied the benefits of, and/or subjected to discrimination and/or retaliation by Defendant, and by and through its agents, servants, and/or employees, because of his disability and for requesting reasonable accommodations, said acts including, but not limited to: failing to provide reasonable accommodations for Plaintiff's disability and/or withdrawing previously granted reasonable accommodations.

215.    Defendant failed and refused to initiate and/or meaningfully participate in an informal or formal dialogue to determine what reasonable accommodations were needed by Plaintiff.

216.    Defendant refused to enter any meaningful interactive process to determine what reasonable accommodations were needed by Plaintiff.

217.    While employed by Defendant, Plaintiff was subjected to discrimination and/or retaliation because of his disability and/or requesting reasonable accommodations by Defendant,

and by and through its agents, servants, and/or employees, said acts being made unlawful by the Americans with Disabilities Act, 24 U.S.C. 12101 et seq., said acts including, but not limited to: failing to provide reasonable accommodations for Plaintiff's disability and/or withdrawing previously granted reasonable accommodations.

218.   Defendant failed to acknowledge Plaintiff's impairments and required that he perform work that exceeded what he was capable of without a reasonable accommodation.

219.   Defendant engaged in said discriminatory practices with malice or reckless indifference to the protected rights of Plaintiff.

220.   As a direct and proximate result of Defendant's violation of the ADA, as aforestated, Plaintiff has suffered depression, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future.

221.   As a further direct and proximate result of Defendant's violation of the ADA, Plaintiff has been placed in financial distress and has suffered a loss of earning and benefits, and a loss of and impairment of his earning capacity and ability to work, and will so suffer in the future; he has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

WHEREFORE, Plaintiff respectfully prays that this Court find in favor of Plaintiff and against Defendant in the form of the order of this Court: 1) declare that the aforementioned practices and actions of Defendant constitute unlawful employment practices in violation of the Americans with Disabilities Act, 42 U.S.C. 12101 et seq., 2) award Plaintiff all lost wages, past and future, to which he is entitled, 3) award Plaintiff all compensatory, punitive, and exemplary damages, 4) award Plaintiff all expenses and

attorney's fees, with interest at the highest lawful rate, and, 5) award any such other relief as this Court deems just and proper.

## COUNT II
## DISCRIMINATION IN VIOLATION OF THE ADAAA

222.    Plaintiff hereby incorporates by reference every allegation and averment in the preceding and foregoing paragraphs as though fully set forth herein.

223.    Defendant subjected Plaintiff to disparate treatment, harassment, and/or termination, as set forth herein, in whole or in part because of his disabilities, said acts being made unlawful by the Americans with Disabilities Act, 42 U.S.C. 12101 et seq. ("ADA"/"ADAAA").

224.    Defendant violated the ADA, among other things, by the following acts:

   a.    Discharging or otherwise limiting, segregating, or classifying Plaintiff in a way that adversely affected the opportunities or status of Plaintiff because of his disabilities and/or requests for accommodation;

   b.    Subjecting Plaintiff to disparate treatment and harassment based on his disabilities and/or requests for accommodation;

   c.    Creating and subjecting Plaintiff to a hostile work environment based on Plaintiff's disabilities and/or requests for accommodation.

225.    Defendant engaged in said discriminatory practices with malice or reckless indifference to the federally protected rights of Plaintiff.

226.    The decision of Defendant to ignore the complaints of Plaintiff suggests awareness of the practice and approval of the practice that would warrant the imposition of punitive damages.

227.    As a direct and proximate result of Defendant violation of the ADA, as aforestated, Plaintiff has suffered aggravation of his disabilities and their symptoms, depression, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment,

and the physical effects associated therewith, and will so suffer in the future.

228.    As a further direct and proximate result of Defendant's violation of the ADA, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of his earning capacity and ability to work and will so suffer in the future; he has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

WHEREFORE, Plaintiff respectfully prays that this Court find in favor of Plaintiff and against Defendant in the form of the order of this Court: 1) declare that the aforementioned practices and actions of Defendant constitute unlawful employment practices in violation of the Americans with Disabilities Act, 42 U.S.C. 12101 et seq., 2) award Plaintiff all lost wages, past and future, to which he is entitled, 3) award Plaintiff all compensatory, punitive, and exemplary damages, 4) award Plaintiff all expenses and attorney's fees, with interest at the highest lawful rate, and, 5) award any such other relief as this Court deems just and proper.

### COUNT III
### RETALIATION, INTERFERENCE, COERCION AND/OR INTIMIDATION IN VIOLATION OF THE ADA

229.    Plaintiff hereby incorporates by reference every allegation and averment in the preceding and foregoing paragraphs as though fully set forth herein.

230.    During the time Plaintiff was employed by Defendant, Plaintiff engaged in protected activity under the ADA.

231.    Plaintiff opposed acts and practices made unlawful by the ADA, including, but not limited to, failing to accommodate Plaintiff's disability, withdrawing previous accommodation(s) for Plaintiff's disability, and/or subjecting Plaintiff to disparate treatment, harassment, and/or

discrimination on the basis of his disabilities, as set forth herein.

232.    Plaintiff requested reasonable accommodations.

233.    Defendant retaliated and discriminated against Plaintiff for engaging in said protected activity, as set forth herein.

234.    During the time Plaintiff was employed by Defendant, he exercised and/or enjoyed rights granted and/or protected by the ADA, including, but not limited to, requesting and making use of reasonable accommodations for his disability, as set forth herein.

235.    Defendant coerced, intimidated, and/or threatened Plaintiff because he exercised and/or enjoyed rights granted and/or protected by the ADA, as set forth herein.

236.    Defendant interfered with Plaintiff because he exercised and/or enjoyed rights granted and/or protected by the ADA, as set forth herein.

237.    As a direct and proximate result of Defendant violation of the ADA, as aforestated, Plaintiff has suffered aggravation of his disabilities and its symptoms, depression, emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future.

238.    As a further direct and proximate result of Defendant's violation of the ADA, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of his earning capacity and ability to work and will so suffer in the future; he has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

WHEREFORE, Plaintiff respectfully prays that this Court find in favor of Plaintiff and against Defendant in the form of the order of this Court: 1) declare that the

aforementioned practices and actions of Defendant constitute unlawful employment practices in violation of the Americans with Disabilities Act, 42 U.S.C. 12101 et seq., 2) award Plaintiff all lost wages, past and future, to which he is entitled, 3) award Plaintiff all compensatory, punitive, and exemplary damages, 4) award Plaintiff all expenses and attorney's fees, with interest at the highest lawful rate, and, 5) award any such other relief as this Court deems just and proper.

## COUNT IV
## VIOLATION OF FMLA

239.    Plaintiff hereby incorporates by reference every allegation and averment in the preceding and foregoing paragraphs as though fully set forth herein.

240.    The FMLA makes it unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right pursuant to the FMLA.

241.    Defendant is an employer within the meaning of the FMLA.

242.    Plaintiff was eligible for and entitled to the benefits under the FMLA.

243.    Defendant interfered with, restrained, and denied Plaintiff's exercise, and attempted exercise, of rights pursuant to the FMLA by denying his request and interfering with his attempts to use leave and then terminating his employment for requesting leave.

244.    Defendant retaliated against Plaintiff for his exercise and attempted exercise of FMLA rights by terminating his employment.

245.    Defendant is an "employer[s]" as that word is defined at 29 U.S.C. Section 2611(4)(A)(i).

246.    Defendant is a "person" as that word is defined at 29 U.S.C. Section 2611(8).

247.    Defendant was at all times material hereto engaged in "commerce" or were engaged in an "industry or activity affecting commerce," as that word and phrase are defined in 29 U.S.C.

Section 2611(1) and at 29 U.S.C Section 142(1) and (3), as made applicable by 29 U.S.C. section 2611(1).

248.    Plaintiff was an "eligible employee" as that phrase is defined by 29 U.S.C. Section 2611(2)(A)(i) and (ii).

249.    Plaintiff was not designated by Defendant as a "key employee" under the FMLA.

250.    Plaintiff experienced disability discrimination based upon his diagnosed disabilities, including mental impairments, dyslexia, spelling accuracy, and dyscalculia, which substantially limits one or more of his major life activities, including, but not limited to: accomplishment of his daily routines of life, concentrating, thinking, communicating, interacting with others, working.

251.    Plaintiff attempted to exercise his rights under the FMLA by submitting his request for FMLA.

252.    Defendant interfered with Plaintiff's exercise, and attempted exercise of rights pursuant to the FMLA by interfering with his attempts to use leave by, among other things, denying his request for FMLA leave because Defendant terminated Plaintiff while he was on administrative leave.

253.    Defendant violated Plaintiff's rights under the Family and Medical Leave Act and willfully manipulated, interfered with, restrained and denied Plaintiff the exercise of rights provided by the FMLA and its implementing regulations.

254.    Defendant interfered with, restrained and/or denied the exercise by Plaintiff of his rights under 29 U.S.C. Section 2601, et seq. in violation of 29 U.S.C. Section 2615(a).

255.    Defendant retaliated against Plaintiff for requesting leave that he was entitled to pursuant to U.S.C. Section 2612(e)(2)(B).

256.    Defendant willfully violated the FMLA and retaliated against Plaintiff by

terminating his employment soon after he requested and was wrongfully denied the right to exercise his rights under FMLA.

257.    Plaintiff is entitled to all damages authorized by 29 U.S.C. § 2617, including lost wages and benefits, interest, liquidated damages, attorneys' fees, and equitable relief.

WHEREFORE Plaintiff respectfully prays for judgment in his favor and against Defendant in the form of an order of this Court: (1) awarding his back pay in an amount yet to be determined; (2) awarding his front pay in an amount yet to be determined; (3) awarding his lost fringe benefits in an amount yet to be determined; (4) awarding his liquidated damages in an amount yet to be determined; (5) awarding him the costs and expenses, including, but not limited to, attorneys' fees and expert witness' fees, incurred in prosecuting his claims of discrimination; (6); and (7) awarding such other and further relief as this Court deems just and proper.

## COUNT V
### DISCRIMINATION AND RETALIATION UNDER 42 U.S.C. SECTION 1981

258.    Plaintiff hereby incorporates by reference each and every allegation and averment in the preceding and foregoing paragraphs as though fully set forth herein.

259.    Defendant's discriminatory and retaliatory practices violated Plaintiff's rights to the full and equal enjoyment of all benefits, privileges, terms, and conditions of his employment.

260.    Defendant's creation of a hostile environment, suspension and the resulting discharge interfered with the rights to continued employment because of race or because of a protected activity in violation of 42 U.S.C. 1981.

261.    Plaintiff was discriminated and/or retaliated against by Defendant due to his complaints of Defendant's discriminatory actions in the workplace based upon race, which thereby impaired his contractual relationship with Defendant in violation of Section 1981.

262.    Plaintiff opposed the acts he believed in good faith violated Section 1981.

263.    Defendant illegally discriminated and/or retaliated against Plaintiff with regard to the terms and conditions of his employment on account of his complaints about Defendant's discriminatory actions in the workplace based upon race.

264.    Plaintiff complained about the illegal discrimination and harassment and was subject to retaliation as a result of his complaints leading to his discharge from employment.

265.    Defendant acted with willful and wanton disregard for the equal rights of African-American employees who worked for Defendant and engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

266.    As a direct and proximate result of Defendant's conduct, Plaintiff sustained and will continue in the future to sustain damages in the form of lost income, emotional pain, suffering, mental anguish, inconvenience and loss of enjoyment of life.

WHEREFORE, Plaintiff prays that this Court grant the following remedies: (a) Declare that the aforementioned practices and actions of Defendant constitute unlawful employment practices in violation of 42 U.S.C. Section 1981; (b) award Plaintiff all lost wages, past and future, to which they are entitled; (c) award Plaintiff compensatory damages; (d) award Plaintiff punitive and exemplary damages; (e) award Plaintiff reasonable attorney's fees, costs, and interest; and, (f) award such other relief as this Court deems just and proper.

## COUNT VI
### Title VII – Discrimination and Retaliation

267.    Plaintiff hereby incorporates by reference every allegation and averment in the preceding and foregoing paragraphs as though fully set forth herein.

268.    Defendant engaged in a pattern and practice of retaliation against Plaintiff because he engaged in a protected activity, in violation of 42 U.S.C. §2000e-3(a).

269.    Plaintiff, in good faith, opposed conduct he reasonably believed to be unlawfully discriminatory on the basis of race by opposing the comments and reporting them to upper management and university administrators.

270.    Defendant retaliated against Plaintiff in response to his protected activity.

271.    Plaintiff's protected activity was a determining or motivating factor in Defendant's decision to place Plaintiff on an administrative leave, and eventually terminate him.

272.    The retaliation consisted of materially adverse actions, which included being forced to take multiple fit for duty examinations without cause, being placed on leave, and being terminated.

273.    A reasonable person would be dissuaded from reporting racial discrimination and racially-offensive comments in the workplace if doing so would result in being forced to take multiple fit for duty examinations, being placed on leave and terminated.

274.    Plaintiff has suffered damages as a direct and proximate result of the retaliation he has suffered, including but not limited to lost wages, front pay, stress, humiliation, anxiety and other forms of emotional distress.

WHEREFORE, Plaintiff Garret Moyer prays for judgment against Defendant, for actual, compensatory and punitive damages, all costs, expenses and attorney's fees incurred herein, for reinstatement and appropriate equitable relief, for interest at the highest lawful rate, and all other relief the Court deems fair and equitable.

## COUNT VII
## RETALIATION AND HOSTILE WORK ENVIRONMENT
### (In Violation of the First Amendment of the United States Constitution)

275.    Plaintiff hereby incorporates by reference every allegation and averment in the preceding and foregoing paragraphs as though fully set forth herein.

276.    The First Amendment of the United States Constitution protects public employees such as Plaintiff from retaliation for exercising their right to free and protected speech.

277.    The complaint made by Plaintiff was speech protected by the First Amendment.

278.    In making his complaint, his complaint was outside the scope of his ordinary job duties and independent of his obligations as a public employee.

279.    Furthermore, the content, form and context of Plaintiff's complaint was that of clear public concern.

280.    More specifically, Plaintiff's allegations of misconduct, malfeasance in office, incompetence and neglect of duty on behalf of the Defendant concerns issues that squarely implicate the interests of the public.

281.    When balancing the First Amendment rights of Plaintiff with the Defendant's interest in providing effective public services, there does not exist a countervailing interest of the Defendant to control the operation of its workplace by interfering with Plaintiff's rights.

282.    The facts demonstrate that the current situation was not an ordinary workplace dispute. Instead, Plaintiff was speaking out as a citizen regarding government misconduct, and his speech warrants protection under the First Amendment.

283.    Plaintiff's interest in commenting on the issue outweighs the potential disruptive effect of that speech.

284.    Defendant subjected Plaintiff to a campaign of suspension, termination, harassment and ridicule in retaliation for exercising his First Amendment rights. Such harassment was in the form of, among other things, Defendant requiring Plaintiff be medically evaluated, Defendant filing a complaint with the state and instituting an action concerning Plaintiff's license, suspending and terminating Plaintiff's employment.

285.    It can be reasonably inferred that Plaintiff's complaint was a substantial motivating factor for the retaliation and numerous adverse employment actions that he was subjected to, some of which are detailed throughout this Complaint.

286.    As such, the Defendant retaliated against Plaintiff on a basis that infringed on his constitutionally protected interests, specifically his interest in freedom of speech.

287.    Accordingly, the Defendant penalized and inhibited Plaintiff from exercising freedoms through his constitutionally protected speech. Such interference with Plaintiff's constitutional rights is impermissible and produces a result which the Defendant could not command directly.

288.    As the result of this unlawful conduct perpetrated against his by the Defendant, Plaintiff has suffered damages, some of which are articulated below.

WHEREFORE, Plaintiff Garret Moyer prays for judgment against Defendant, for actual, compensatory and punitive damages, all costs, expenses and attorney's fees incurred herein, for reinstatement and appropriate equitable relief, for interest at the highest lawful rate, and all other relief the Court deems fair and equitable.

## PRAYER

As a result of discrimination and/or retaliation, Plaintiff Garret Moyer has been damaged, sustaining economic loss as well as humiliation, embarrassment, and emotional distress, and other damages, as a proximate result of Defendant's termination of Plaintiff, his reputation as a faithful, hardworking, loyal and diligent employee has been irreparably damaged.

The retaliatory conduct of Defendant's wrongful discrimination and/or retaliation of

Plaintiff constitutes a willful, wanton and malicious act.

WHEREFORE, Plaintiff prays for judgment against the Defendant in excess of $75,000 for:

      a.   Back pay and value of benefits from date of termination;

      b.   Future loss of pay and fringe benefits from date of termination;

      c.   Compensating damages for the loss of Plaintiffs reputation;

      d.   Damages for mental anguish, humiliation and embarrassment;

      e.   Any other damages allowed by law;

      f.   Punitive damage;

      g.   Attorney fees, cost of this action, and for such other and further relief as the court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury on all claims so triable.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Wichita, Kansas as the place of trial.

Respectfully submitted,

/s/ Aaron C. McKee
Aaron C. McKee      KS # 20889
MCKEE LAW, L.L.C.
222 South Cherry Street
Olathe, Kansas 66061
Phone: (913) 768-6400
Facsimile: (913) 768-6420
aaronmckee@ksmoemploymentlaw.com
**ATTORNEY FOR PLAINTIFF**